# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JAMES RIVEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0848-PWG |
| | ) | |
| HAUPPAUGE DIGITAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MASTER'S REPORT

Date Submitted: October 26, 2021
Final Report January 24, 2022

Marcus E. Montejo, PRICKETT, JONES & ELLIOT, Wilmington, Delaware, *Attorney for Plaintiff*.

Douglas J. Cummings, KOLLIAS LAW LLC, Wilmington, Delaware, *Attorney for Defendant*.

**GRIFFIN, M.**

This post-trial report concludes a highly-litigated books and records action brought under Section 220 of the Delaware General Corporate Law ("DGCL") by a stockholder against a company whose common stock once traded in the public markets but has since gone "dark." The company's stock is still held by members of the public, and the company has made no disclosures to stockholders since 2014. The stockholder seeks to inspect the company's books and records to value his stock in the company. The company claims that the stockholder's purpose is improper and, if the inspection is allowed, that the strongest confidentiality protections allowable should be ordered. The stockholder, relying upon the Delaware Supreme Court's holding in *Tiger v. Boast Apparel, Inc.* ["*Tiger*"],[1] argues that no confidentiality restrictions should be imposed. I conclude that, under *Tiger*, the company has shown a need for confidentiality, and recommend that the Court order that the requested information be produced subject to a two-year confidentiality restriction. This is a final report.

---

[1] 214 A.3d 933 (Del. 2019).

# I.    Factual Background[2]

## A.    *The Parties*

This matter is an action for the production of the books and records of Hauppauge Digital, Inc. ("Company") brought by James Rivest ("Rivest"), a stockholder in the Company, under Section 220 of the DGCL.[3]   The Company develops, manufactures, and sells personal computer-based television tuners, data broadcast receivers and video capture products.[4]  The Company was incorporated in the State of Delaware on August 2, 1994.[5] Kenneth Plotkin ("Plotkin") is a co-founder of the Company, and the Company's sole director and chief executive officer.[6] Gerald Tucciarone ("Tucciarone") is the Company's chief financial officer, secretary, and investor relations representative.[7]

---

[2] I refer to the Joint Trial Exhibits as "JX."  I refer to the transcript of the October 26, 2021 trial as "Trial Tr." and to the transcript of the October 14, 2021 pre-trial conference as "PTC Tr."  The Pre-Trial Stipulation, D.I. 47, is referred to as "Stip."

[3] Docket Item ("D.I.") 1.

[4] Stip., ¶ 7; Trial Tr. 83:14-24.

[5] Stip., ¶ 6. The Company has two wholly-owned subsidiaries, Hauppauge Computer Works, Inc. and HCW Distributing Corp., which were both incorporated in the State of New York in the 1980s. *Id.*

[6] *Id.*, ¶ 10.  Plotkin has served as a director of the Company since it was incorporated. *Id.*

[7] *Id.*, ¶ 11; Trial Tr. 165:11-12.

On January 10, 1995, the Company completed a public offering of its common stock.[8] Prior to July 28, 2014, the Company's stock traded on a national securities exchange.[9] Between 1995 and 2014, the Company filed regular public disclosures with the Securities and Exchange Commission ("SEC").[10] Between 2010 and 2011, the Company suffered a "pretty large decline in sales due to the loss of business with" two large customers.[11] As a result, the Company's auditors issued a "going concern" opinion in the Company's 2013 10-K report, indicating that, due to a "history of operating losses[, ] there can be no assurance that [the Company] will be profitable in the future,"[12] or that the Company will generate enough cash internally to satisfy its cash needs for the next 12 months.[13] The going concern warning adversely impacted the Company's operations, with manufacturers and suppliers restricting the Company's access to credit.[14] Plotkin testified that the Company "lost

---

[8] JX-001. On October 31, 2006, the Company filed a registration for a secondary offering. JX-002.

[9] Stip., ¶ 12.

[10] *See generally EDGAR Entity Landing Page Hauppauge Digital Inc*, Sec. & Exch. Comm'n, https://www.sec.gov/edgar/browse/?CIK=930803 (last visited January 23, 2022). This Court may, in appropriate circumstances, take judicial notice of a corporation's public filings with the SEC. *See In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170-171 (Del. 2006); *In re Primedia, Inc. S'holder Litig.*, 2013 WL 6797114, at *8-11 (Del. Ch. Dec. 20, 2013).

[11] *Id*. 85:13-17.

[12] *Id*. 87:12-16; *see also* JX-039, at 27.

[13] Trial Tr. 173:7-18; JX-039, at 28.

[14] Trial Tr. 178:6-18. The Company's Asian-based suppliers reduced the amount of credit available to the Company for purchasing products to match the amount of credit insurance

business because of those financials."[15]  He relayed an incident in January of 2014 meeting with a buyer for one of the Company's largest purchasers related to the buyer's intention to remove the Company's products from its shelves.[16]  During the meeting, Plotkin saw copies of the Company's 10-K reports, as well as samples of a competitor's products, on the buyer's desk.[17]

In discussions with the Company's securities' attorney on ways to cut the Company's expenses, the Company's securities attorney suggested de-registering as a public company to eliminate the costs associated with public filings, etc.[18]  Plotkin testified that the intention was to "go dark for a period of time, with the goal of getting the company righted so that we could … start to publish our financials at some point in the future."[19]  On July 28, 2014, the Company filed a Form 15 with the SEC, representing that it had fewer than 300 stockholders of record, so that it was no longer subject to the mandatory reporting requirements of the federal

---

that the suppliers could obtain on the receivables owed by the Company. *Id*. 182:1-21. However, these suppliers continued to cut the Company's credit as the Company did less business with them, even after the Company stopped making public financial disclosures under SEC regulations. *Id*. 183:6-14.

[15] *Id.* 96:4-7.

[16] *Id.* 93:9-12.

[17] *Id*. 93:15-18.  Plotkin testified that he and the buyer discussed that the Company's products were going to be replaced by the competitor's products, but did not discuss the Company's finances. *Id*. 94:3-10.

[18] *Id*. 95:7-18.

[19] *Id*. 97:4-8.

4

securities laws.[20]  From July 28, 2014 until September 28, 2021, the Company's stock were listed on the Pinksheets as a stock traded on the over-the-counter ("OTC") markets.[21]  Since July 28, 2014, the Company has made no public disclosures or disclosures to its stockholders.[22]

Rivest is a resident of Florida and a beneficial owner of common stock of the Company.[23]  Rivest ran an investment partnership for about 10 years before retiring.[24]  He described his investment strategy as "deep value investments and special situation investing," in which he buys stock at a lower market price than its intrinsic value or in special situations, such as spin-offs, tender offers, and bankruptcies.[25]  Rivest first invested in the Company after reading about the Company on a blog devoted to "dark" companies that traded on the OTC markets.[26] He looked at the Company's old SEC filings, noted that the Company had "good sales years ago," and concluded that the Company was "incredibly cheap."[27]  As part

---

[20] JX-003.

[21] Stip., ¶ 14.

[22] JX-027, 3-4; Trial Tr. 153:23-154:2; *id.* 170:1-14; *see also* JX-004, at 3-4 (conversation between an investor and Tucciarone, in which Tucciarone stated that the Company would not make financial disclosures to a stockholder).

[23] Stip., ¶ 1.

[24] Trial Tr. 12:18-23.  Rivest has limited to no formal education in finance or investing. *Id.* 12:7-15.

[25] *Id.* 20:7-8; *id.* 20:15-22.

[26] *Id.* 22:16-23:24; *see also* JX-004.

[27] Trial Tr. 24:4-13.

of his investment strategy with OTC companies, Rivest would typically buy a few shares of a corporation's stock, and send a Section 220 demand to the corporation seeking financial information.[28]

## B. Rivest's Section 220 Demands

On July 29, 2019, Rivest mailed to the Company's principal place of business in Hauppauge, New York via certified mail a letter demanding an inspection of the books and records of the Company to value his stock holdings ("July 2019 Demand").[29] Rivest, who was not represented by counsel at that time, testified that he received a return receipt signed by Plotkin but no longer has it.[30] Plotkin testified that he had no record of receiving the July 2019 Demand.[31] The Company did not respond to the July 2019 Demand.[32]

On October 8, 2019, Rivest, through his counsel, sent to the Company's principal place of business in Hauppauge, New York via email and Fedex a letter demanding the right to inspect the books and records of the Company ("October

---

[28] *Id*. 26:24-27:3; *id*. 27:15-18; *see also* JX-029, at 12.

[29] JX-005; Trial Tr. 28:11-20.

[30] Trial Tr. 28:23-29:6; *id*. 29:18-20.

[31] *Id*. 120:14-23.

[32] *Id*. 29:12-16.

2019 Demand").[33] Rivest stated that he sought to value his stock and inspect two categories of books and records:

(1) Monthly, quarterly and annual financial statements and financial reports, including income statements, balance sheets, statements of cash flow and all similar documents for the Company for the years 2016, 2017, and 2018.

(2) Appraisals, valuations or analyses mentioning or otherwise referring to or relating to the value of the Company, its stock or any of its assets.[34]

And, on April 24, 2020, Rivest sent to the Company's principal place of business in Hauppauge, New York via email and Fedex a letter demanding the right to inspect the books and records of the Company ("April 2020 Demand"), in order to value his stock, and sought an additional category of books and records:

Monthly, quarterly and annual financial statements and financial reports, whether audited or not, including income statements, balance sheets statements of cash flow, budgets, forecasts or projections and all similar documents for the company for the years 2019 and 2020.[35]

C.     *The New SEC Rule*

On September 25, 2019, the SEC issued a notice of proposed rulemaking, proposing a new rule under the Securities and Exchange Act of 1934 regarding publication or submission of quotations in the OTC market without specified

---

[33] JX-008.

[34] *Id.*

[35] JX-010.

7

information.[36]  On October 27, 2020, the SEC issued a final rule pursuant to that notice of proposed rulemaking ("New SEC Rule"), which became effective on December 28, 2020,[37] and had a compliance date of September 28, 2021.[38]  The purpose of the New SEC Rule is to "set[] out certain requirements for a broker-dealer seeking to initiate (or resume) quotations for securities in the OTC market."[39]

For the stock of companies traded on the OTC markets, the New SEC Rule makes it unlawful for a broker-dealer to publish a quotation unless the broker-dealer has current and publicly available information about the company in its records.[40]  "Current" means information that is accurate within 12 months of publication or submission of the quotation, including the company's most recent financial

---

[36] *See* Publication or Submission of Quotations Without Specified Information, 84 Fed. Reg. 58206 (proposed Oct. 30, 2019).

[37] *See* Publication or Submission of Quotations without Specified Information, 85 Fed. Reg. 68124 (Oct. 27, 2020), *codified at* 17 C.F.R. § 240.15c2-11(a)(1).

[38] 85 Fed. Reg. at 68172.

[39] *Id*. at 68124.  The motivating concern behind this New SEC Rule was that "no or limited current public information [is] available about certain issues of quoted OTC securities" and broker-dealers, as defined by the Securities and Exchange Act of 1934, could manipulate market prices in the OTC markets because "broker-dealers play an integral role in facilitating investor access to OTC securities." *Id*. at 68125.

[40] 17 C.F.R. § 240.15c2-11(a)(1)(i)(B), (b)(5)(i), (b)(5)(ii).  There is a "piggyback exception," which "allows a broker-dealer to rely on the quotations of another broker-dealer that initially complied with the information review requirement … so long as there are no more than four business days in succession without a [compliant] quote." 85 Fed. Reg. at 68126; *see also* 17 C.F.R. § 240.15c2-11(f)(3).

statements and similar financial information for the two preceding fiscal years.[41] By its own terms, the New SEC Rule only regulates broker-dealers and imposes no sanction on the corporations whose stock is traded on the OTC markets.[42]

Rivest filed a comment in response to the SEC's September 25, 2019 notice of proposed rulemaking ("Comment"), expressing his disagreement with the proposed rule.[43] He described the then-state of the OTC market as "caveat emptor," or let the buyer beware, and argued that cutting off retail investor access to trading on the OTC markets would be a "draconian solution to combatting the fraudulent and manipulative schemes targeting retail investors."[44] Rivest did not mention his holdings in the Company or this litigation.[45] The SEC's notice of final rulemaking specifically addressed the Comment.[46]

Since the New SEC Rule's compliance date of September 28, 2021, the Company's common stock has been removed from the Pinksheets on the OTC

---

[41] *Id.* § 240.15c2-11(e)(2)(i), (b)(5)(i). The balance sheet included in this information may be up to 16 months old. *Id.* § 240.15c2-11(b)(5)(i)(L).

[42] 17 C.F.R. § 240.15c2-11(a)(1).

[43] JX-007. In the Comment, Rivest expressed his opinion that "[t]he proposed rule would be a disaster for investors who invest in legitimate OTC companies that provide little to no public information." *Id.*, at 1.

[44] *Id.*, at 2.

[45] *See generally* JX-007.

[46] *See generally* Publication or Submission of Quotations Without Specified Information, 85 Fed. Reg. 68124 (Oct. 27, 2020).

Markets.[47]   Under the New SEC Rule, the Company's stock is only trading in the OTC "Expert Markets" because of a lack of currently available public information.[48]

## D.   *Procedural History*

On October 24, 2019, Rivest filed this action.[49]   The Company was served but failed to timely respond.[50]   On December 4, 2019, Rivest moved for default judgment against the Company and, when no response was filed by the Company, default judgment was entered, on April 24, 2020 at 9:50 a.m., against the Company.[51] Hours later, at 2:30 p.m. on April 24, 2020, the Court received a letter from Plotkin, purporting to represent the Company *pro se*, in response to Rivest's default judgment motion.[52]   The Company subsequently retained Delaware counsel and moved to vacate the default judgment, arguing excusable neglect and that it had a meritorious argument that the Section 220 production must be subject to confidentiality restrictions.[53]   On August 3, 2020, the Court vacated the default judgment, finding

---

[47] JX-038.

[48] *Id.*; Trial Tr. 41:19-42:3.

[49] D.I. 1.

[50] D.I. 5.

[51] D.I. 11.

[52] D.I. 13.  The Court informed Plotkin that a corporation could only be represented before a court by a licensed attorney but allowed the Company the opportunity to retain Delaware counsel. D.I. 18; D.I.19; D.I. 22.

[53] D.I. 21; D.I. 23.

10

that the neglect in response was excusable and that the Company had cited sufficient evidence to raise the issue of confidentiality.[54]

On April 21, 2021, the Court entered a case scheduling order.[55] On August 17, 2021, Rivest moved to supplement his pleading and add the April 2020 Demand to the litigation.[56] The Company opposed this motion, arguing futility.[57] On September 21, 2021, the Court granted the motion to supplement the pleadings, holding that Defendant's futility argument went to the merits and that the interests of justice would be best served by a full adjudication of the parties' disputes at trial.[58] Rivest filed his supplemented complaint on September 27, 2021.[59]

On September 17, 2021, the Company moved for summary judgment ("Motion"), arguing that, on undisputed facts, Rivest could not establish a proper purpose.[60] In the Motion, the Company raised for the first time in this litigation the New SEC Rule.[61] On September 21, 2021, I denied the Motion without prejudice to the Company's arguments, finding that summary judgment would not obviate the

---

[54] D.I. 28, *adopted* D.I. 29 (Aug. 11, 2020).

[55] D.I. 36.

[56] D.I. 39.

[57] D.I. 40.

[58] D.I. 42.

[59] D.I. 45.

[60] D.I. 40.

[61] *Id.*; *see also* PTC Tr. 13:12-23.

need for trial and that briefing on the Motion could not be accommodated, given the proximity to trial and pre-trial deadlines.[62]

The parties filed their pre-trial stipulation on September 30, 2021.[63] On October 7, 2021, three hours before the deadline to file pre-trial briefing, the parties filed a stipulated request to extend the pre-trial briefing deadline to October 12, 2021.[64] I denied this request but granted an extension to October 8, 2021 at 2:00 p.m.[65] At 12:47 p.m. on October 8, 2021, the Company filed an Emergency Motion to Amend the Scheduling Order, for Relief from Order, or, in the Alternative, to Continue Trial ("Emergency Motion"), arguing unfair surprise and discovery violations by Rivest and requesting a continuance so that the Company could fully brief its previously-denied summary judgment motion.[66] Rivest filed his pre-trial brief before the deadline on October 8, 2021.[67] I requested further information from the Company so that I could address the Emergency Motion at the already-scheduled pre-trial conference.[68]

---

[62] D.I. 41. The Motion was filed "about five weeks prior to trial and days before some pre-trial filing deadlines occur[red]." *Id.*

[63] D.I. 47.

[64] D.I. 48.

[65] D.I. 49.

[66] D.I. 50.

[67] D.I. 51.

[68] D.I. 53.

At the October 14, 2021 pre-trial conference, I denied the Company's Emergency Motion, its application to seal the courtroom during the evidentiary hearing, and its request to designate both Plotkin and Tucciarone as corporate representatives.[69] An evidentiary hearing took place on October 26, 2021.[70]

## II. Analysis

"Section 220(c) provides that stockholders who seek to inspect a corporation's books and records must establish that (1) such stockholder is a stockholder; (2) such stockholder has complied with Section 220 respecting the form and manner of making demand for inspection of such documents; and (3) the inspection such stockholder seeks is for a proper purpose."[71] The parties have stipulated that Rivest is a stockholder of the Company.[72] The parties do not dispute the form and manner

---

[69] D.I. 56.

[70] D.I. 59.

[71] *AmerisourceBergen Corp. v. Lebanon Cty. Empls. Ret' Fund*, 243 A.3d 417, 425 (Del. 2020) (cleaned up).

[72] *See* Stip., ¶ 1.

13

of the Rivest's demands,[73] or the scope of inspection.[74] The parties dispute whether Rivest has established a proper purpose and whether any confidentiality restrictions should attach to the inspection rights.[75]

---

[73] At the pre-trial conference, Rivest represented that he was not pursuing relief under the July 2019 Demand. *See* PTC Tr. 74:22-23. At trial, the Company indicated it was not going to pursue any claims regarding the sufficiency of the October 2019 and April 2020 Demands. *See* Trial Tr. 73:15-19. A Section 220 demand "shall state the person's status as a stockholder, be accompanied by documentary evidence of beneficial ownership of the stock, and state that such documentary evidence is a true and correct copy of what it purports to be." 8 *Del. C.* § 220(b). "The demand under oath shall be directed to the corporation at its registered office in this State or at its principal place of business." *Id.* Both the October 2019 and April 2020 Demands were made under oath, delivered to the Company's principal place of business, and provided a proximate E*TRADE account statement showing Rivest's holdings in the Company's stock. *See* JX-008; JX-010. *See Jacob v. Bloom Energy Corp.*, 2021 WL 733438, at *5 (Del. Ch. Feb. 25, 2021) (it is the stockholder's burden "to provide proper documentary evidence of beneficial ownership of stock at a point proximate to the date of his demand"); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 776 (Del. Ch. 2016), *abrogated in part on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019). Therefore, the October 2019 and April 2020 Demands were sufficient for a Section 220 demand.

[74] The April 2020 Demand sought budgets, forecasts and projections, in addition to financial statements and reports, for 2019 and 2020. *See* JX-010. At the pre-trial conference, the Company indicated that it would contest the scope related to forward-looking documents. PTC Tr. 46:4-8. At the start of trial, Rivest indicated he was limiting his demands to historical financial statements or monthly, quarterly, and annual financial statements for periods that closed during fiscal years 2016 through 2020 (not projections, budgets, forecasts, or appraisals). Trial Tr. 5:5-14; *id.* 6:24-7:19. The parties did not pursue arguments regarding scope during trial. I note that the testimony of Plotkin and Tucciarone indicated that the Company does not prepare monthly or audited statements. *Id.* 148:14-22; *id.* 179:23-180:2.

[75] *See* Stip., ¶¶ 17-41.

14

## A. *Rivest has a Proper Purpose*

Rivest argues that he has a proper purpose in valuing his stock holdings in the Company.[76] The Company challenges Rivest's valuation purpose, relying on the New SEC Rule and Rivest's discovery responses to argue that Rivest's actual purpose is to subvert the New SEC Rule and to circumvent or unfairly manipulate federal securities law.[77]

A "proper purpose" is "a purpose related to such person's interest as a stockholder."[78] The stockholder must establish this proper purpose by a preponderance of the evidence.[79] "Myriad proper purposes have been accepted under Delaware law including: the determination of the value of one's equity holdings …"[80] This Court has recognized that minority stockholders in companies not subject to reporting requirements by the SEC "may … have a legitimate need to inspect the corporation's books and records to value their investment, in order to decide whether to buy additional shares, sell their shares, or take some other action

---

[76] D.I. 51, at 1.

[77] Trial Tr. 227:2-229:24; D.I. 40, ¶¶ 20-23, 37, 39.

[78] 8 *Del. C.* § 220(b).

[79] *See Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006).

[80] *AmerisourceBergen Corp. v. Lebanon Cty. Empls. Ret' Fund*, 243 A.3d 417, 425 (Del. 2020) (internal quotation marks and citations omitted); *see also Woods v. Sahara Enters., Inc.*, 238 A.3d 879, 889-90 (Del. Ch. 2020) (quoting *Cty. of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 1 A.3d 281, 289 n.30 (Del. 2010)).

to protect their investment."[81] To establish a proper purpose, "Delaware law does not require that a stockholder establish both a proper purpose for seeking inspection … and an end to which the fruits of the inspection will be put."[82] "[O]nce a stockholder has identified a proper purpose, such as valuing shares, the burden shifts to the corporation to prove that the stockholder's avowed purpose is not her actual purpose and that her actual purpose for conducting the inspection is improper."[83] The corporation "may not rebut a proper purpose solely by demonstrating that a secondary improper purpose or additional ulterior motive also exists."[84] Instead, "in order to succeed, [the Company] must prove that [Rivest] pursued [his] claim under false pretenses, and [his] primary purpose is indeed improper."[85]

---

[81] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 685 A.2d 702, 713 (Del. Ch. 1995).

[82] *Woods*, 238 A.3d at 891; *see also AmerisourceBergen Corp.*, 243 A.3d at 430.

[83] *Woods*, 238 A.3d at 891; *AmerisourceBergen Corp.*, 243 A.3d at 429 ("[A] corporation may challenge the *bona fides* of a stockholder's stated purpose and present evidence from which the court can infer that the stockholder's stated purpose is not its actual purpose.").

[84] *Caspian Select Credit Master Fund Ltd. v. Key Plastics Corp.*, 2014 WL 686308, at *4 (Del. Ch. Feb. 24, 2014); *Carapico v. Philadelphia Stock Exch., Inc.*, 791 A.2d 787, 791 (Del. Ch. 2000) ("[t]he existence of a secondary purpose does not defeat plaintiff's claim that his purpose is *bona fide*").

[85] *Woods*, 238 A.3d at 891 (citing *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817 (Del. Ch. 2007)).

Rivest credibly testified that he wanted to value his stock holdings.[86] He further explained the methodology that he would use in valuing his holdings.[87] Based upon this testimony, I conclude that Rivest has a *bona fide* purpose of valuing his holdings in the Company's stock. His need to inspect the Company's books and records is heightened by the fact that the Company makes no public disclosures or disclosures to stockholders.[88] It is well-settled that Delaware law recognizes that valuing stock holdings is a proper purpose for a Section 220 demand.[89] Thus, Rivest has shown a proper purpose.

The Company argues that Rivest's actual purpose is "to circumvent or unfairly take advantage of" the New SEC Rule and to share information with the marketplace for his personal profit at the Company's expense.[90] To succeed, the Company must prove that Rivest pursued his claims under false pretenses, and that his primary

---

[86] Trial Tr. 75:19-76:15; *see also* JX-029, at 7. Rivest has consistently stated that he wants to value his stock holdings using the information that he would gather from the requested production. *See* JX-005; JX-008; JX-010.

[87] Trial Tr. 75:22-77:9; *see also* JX-029, at 7. Rivest testified that he looks "at the income statement, the cash flow statements, and the balance sheet, and then [determines] if the price is much cheaper than the actual intrinsic value of the company." Trial Tr. 76:9-13.

[88] Trial Tr. 166: 17-19; *see Thomas & Betts Corp. v. Leviton Mfg. Co.*, 685 A.2d 702, 713 (Del. Ch. 1995).

[89] *See AmerisourceBergen Corp. v. Lebanon Cty. Empls. Ret' Fund*, 243 A.3d 417, 425 (Del. 2020); *Woods*, 238 A.3d at 889 (citation omitted).

[90] Trial Tr. 227:2-24.

17

purpose is improper. "Such a showing is fact intensive and difficult to establish."[91] Rivest has indicated he intends to share the Company's financial information "with market participants in the public market for the Company's stock to assess the market value of the Company's stock," if it is legal to do so.[92] That intention does not create a question whether Rivest actually wants to value his stock holdings, or show that his purpose is improper; instead, it confirms that Rivest intends to "assess the market value of the Company's stock."[93] The Company's speculation that Rivest's real purpose is to circumvent the New SEC Rule and harm the Company is not supported by the evidence.[94] Even assuming *arguendo* that Rivest's actions related to the New SEC Rule somehow create an improper purpose, the Company has not met its burden of showing that Rivest has pursued valuation under false pretenses. This action was commenced before the New SEC Rule became effective or its compliance date,[95] and it appears Rivest intended to pursue a Section 220

---

[91] *Woods*, 238 A.3d at 891 (quoting *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817 (Del. Ch. 2007)).

[92] Stip, ¶ 4; Trial Tr. 68:1-5.

[93] Stip, ¶ 4; Trial Tr. 68:1-5.

[94] It is not for this Court to decide, in this instance, whether Rivest's future actions, which are speculative, will violate federal securities laws. *See Southpaw Credit Opportunity Master Fund LP v. Advanced Batter Techs., Inc.*, 2015 WL 915486, at *11 (Del. Ch. Feb 26, 2015).

[95] *See* Publication or Submission of Quotations Without Specified Information, 85 Fed. Reg. 68124 (Oct. 27, 2020).

inspection even before the New SEC Rule was proposed.[96] Rivest's Comment may demonstrate that he disagrees with the SEC policies in the New SEC Rule,[97] but I fail to see how that is relevant in determining whether Rivest has stated a proper purpose for a Section 220 demand under the DGCL.[98] Here, I find there is sufficient evidence to show Rivest has established a proper purpose – the valuation of his holdings of the Company's stock – and the Company has not met its burden of showing that Rivest is pursuing his claim under false pretenses.[99]

---

[96] *Compare* JX-005 (July 2019 Demand) *with* Publication or Submission of Quotations Without Specified Information, 84 Fed. Reg. 58206 (proposed Oct. 30, 2019). I recognize that the Company indicated it had no record of receiving the July 2019 Demand. Trial Tr. 120:14-23. And, Rivest is not pursuing relief under the July 2019 Demand. PTC Tr. 74:22-23. I rely upon the July 2019 Demand only to show that Rivest intended to value his stock holdings before the SEC issued its notice of proposed rulemaking for the New SEC Rule. Further, Rivest testified that he typically filed 220 demands with OTC companies in which he held stock as part of his investment strategy. *See* n. 28 *supra* and accompanying text.

[97] *See* JX-007; JX-060; JX-061; JX-062; Trial Tr. 229:3-12.

[98] Any citizen has the right to petition a federal rulemaking agency and to participate in the rulemaking process by filing comments to which that agency must respond. *See* 5 U.S.C. § 551 *et seq.* That right is separate from a stockholder's rights under Section 220 and is not at issue here.

[99] Prior to trial, the Company had suggested that Rivest sought to harass the Company with his Section 220 demand. JX-027, at 5. This Court has recognized that harassment can be an improper purpose for a Section 220 demand. *See, e.g., Alexandria Venture Invs., LLC v. Verseau Therapeutics, Inc.*, 2020 WL 7422068, at *5 (Del. Ch. Dec. 18, 2020). But, I do not find that the factual circumstances that support harassment as an improper purpose are present here. *Cf. Georgia Notes 18, LLC v. Net Element, Inc.*, 2021 WL 5368651, at *4 (Del. Ch. Nov. 18, 2021) (stockholder's actual purpose was pre-litigation discovery to advance its non-stockholder claims against the corporation).

## B. *Confidential Treatment of Section 220 Documents*

The Company argues that Rivest is attempting to use Section 220 to "pry open a non-public company's financial records for all to devour," and that he will use the financial information to circumvent the New SEC Rule and undermine federal securities policy.[100] It further argues that "exceptional circumstances" require the imposition of the "strongest and most restrictive confidentiality protections" for its financial information, or "[f]ive years of confidentiality protection."[101] Specifically, the Company points to the adverse effects that past disclosures have produced; the Company's "particular vulnerability;" and the cost of litigating a breach of a nondisclosure agreement.[102]

In response, Rivest relies on the Supreme Court's ruling in *Tiger*[103] to argue that no confidentiality treatment is warranted for the books and records to be produced.[104] He asserts that there is no need for confidential treatment because partial federal tax returns for the Company are part of the public record in litigation in the State of New York, and because the books and records requested are stale.[105]

---

[100] D.I. 40, ¶ 37; Trial Tr. 227:2-21; *id.* 240:12-16.

[101] Trial Tr. 228:17-229:2; *id.* 245:5-7; *id.* 251:3-16.

[102] *Id.* 242:1-7; *id.* 233:12-234:5; *id.* 249:1-21.

[103] 214 A.3d 933 (Del. 2019).

[104] D.I. 51, at 26-28.

[105] *Id.*, at 28-29.

Rivest contends that his interest in free communications outweighs any Company interest in confidentiality, and challenges whether the Company has shown a strong, legitimate interest in confidentiality.[106]

"There is no presumption of confidentiality in Section 220 productions."[107] "[T]he Court of Chancery certainly has the power to impose reasonable confidentiality restrictions."[108] But, before ordering confidential treatment, the Court "must assess and compare the benefits and harms when determining the initial degree and duration of confidentiality."[109] This imposes a burden on the party seeking confidential treatment, but "the targets of Section 220 demands will often

---

[106] Trial Tr. 208:8-209:9.; *id.* 211:20-24 ("[W]hatever harm was put upon [the Company] by a competitor was about rumors and not financial statements."). Rivest further asserts that allowing confidentiality in this instance is contrary to societal good because the Court would be "providing unregistered public companies some type of competitive advantage over registered public companies." *Id.* 212:1-213:6. And that a public company, whether registered or unregistered, "has no reasonable expectation in the confidentiality of its historical financial statements." *Id.* 202:19-21. In assessing Section 220 demands, this Court considers whether a company treats its financial information as confidential. *See Southpaw Credit Opportunity Master Fund LP v. Advanced Battery Techs., Inc.*, 2015 WL 915486, at *10 (Del. Ch. Feb. 26, 2015). And, if a company "is not publicly reporting, it is more akin to a private company for purposes of this analysis." *Id.*, at *9. Rivest asks that I consider the societal benefits and the effect on competitive advantages if registered or unregistered public companies receive different confidential treatment. I decline to conduct that broader review and, instead, focus on the benefits and harms to the stockholder and corporation in this case related to confidentiality protections.

[107] *Tiger*, 214 A.3d 933, 939 (Del. 2019).

[108] *Id.*

[109] *Id.*; *see also KT4 Partners LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 760 (Del. 2019) ("'[C]aution is needed because use restrictions under § 220(c) have traditionally been tied to case-specific factors.'" (quoting *United Techs. Corp. v. Treppel*, 109 A.3d 553, 561 (Del. 2014))).

21

be able to demonstrate that some degree of confidentiality is warranted where they are asked to produce nonpublic information."[110] "[A] corporation need not show specific harm that would result from disclosure before receiving confidentiality treatment in a Section 220 case," but the Court "cannot conclude reflexively that the need [for confidentiality] is readily apparent."[111] In assessing the need for confidential treatment, this Court seeks to tailor the confidentiality restrictions to the fact-specific circumstances of each case.[112]

First, I consider the potential benefits to Rivest if he is allowed to make the inspection subject to no confidentiality restrictions. Rivest has an interest in being able to share the information he learns from the inspection with other investors who may be interested in purchasing his holdings in the Company's stock.[113] Rivest also argues that the Court should also consider the effect of the New SEC Rule and the cost to him if he cannot disclose financial information so that a quotation for the Company's stock could be published on the OTC markets.[114] This ability to publish

---

[110] *Tiger*, 214 A.3d at 939.

[111] *Id.* (internal quotation marks and citations omitted).

[112] *See generally Shaich v. Panera Hldgs. Corp.*, C.A. No. 2020-0271-MTZ (Del. Ch. Nov. 4, 2020) (TRANSCRIPT at 51-63); *see also KT4 Partners LLC*, 203 A.3d at 760.

[113] Trial Tr. 40:19-41:9.

[114] *See id.* 208:15-209:9; 17 C.F.R. § 240.15c2-11.

22

quotations for the Company's stock might create a benefit to Rivest,[115] but this Court does not craft use and confidentiality restrictions on a Section 220 production based upon the rights and restrictions found in federal securities laws.[116]

Next, I consider the harm to the Company if the financial statements produced for the Section 220 are disclosed. The Company asserts that it is particularly vulnerable because of its current financial position and would be damaged if vendors cut its credit line.[117] It alleges that past financial disclosures (through its 2013 10-K report) resulted in adverse business effects.[118] Previously, the Court set aside a default judgment in consideration of the Company's averment that "industry competitors … have in the past used less-than-stellar financial reports to lure

---

[115] Rivest argues that confidentiality longer than 12 months eliminates the stockholder's right under the New SEC Rule's exception to "get a public bid-and-ask quote for the shares," with "a huge consequence to the stockholder." Trial Tr. 208:19-209:3. This consideration results from the interplay of the New SEC Rule with the pricing of stocks on the OTC markets. Rivest testified that, in purchasing stocks in "dark" companies, he knows that these stocks "are going to be less transparent" and riskier than other stocks, but that he "can make some serious money." *Id.* 25:14-21; *see also* n. 44 *supra* and accompanying text. And, he chose to maintain the Company's stock, even knowing that the New SEC Rule was being put into place. As a stockholder holding stock in a dark company, he assumes the risks associated with that ownership.

[116] *See Southpaw Credit Opportunity Master Fund LP v. Advanced Battery Techs., Inc.*, 2015 WL 915486, at *11 (Del. Ch. Feb. 26, 2015) ("I do not believe ordering parties to comply with federal law is consistent with the intent of Section 220. The inspection right afforded to stockholders under Section 220 is an important feature of the Delaware General Corporation Law, but it is a right entirely separate from the complex overlay of rights and regulations created under the federal securities laws.").

[117] Trial Tr. 242:1-3; *id.* 249:1-9.

[118] *See id*. 232:11-233:4.

23

business opportunities away from [the Company], resulting in a loss of customers."[119]   The evidence produced at trial showed that outside auditors put a "going concern" warning on the Company's 2013 publicly disclosed 10-K report, which resulted in manufacturers and suppliers restricting the Company's access to credit.[120] In meeting with a large customer about that customer's decision to remove the Company's products from its shelves, Plotkin testified that he saw copies of the Company's 2013 10-K report on the customer's desk, along with samples of a competitor's products, which, ultimately, replaced the Company's products.[121] Disclosure of limited financial information through the Section 220 production at issue would present a different situation.   The Company no longer has outside auditors prepare financial statements, so financial information would not include any going concern warning.[122]  Further, the evidence shows that, since the Company de-registered and ended its mandatory reporting obligations, creditors have continued to restrict the Company's access to credit without comparable disclosures.[123]  And, some of the Company's financial information was made public as part of unrelated

---

[119] D.I. 23, ¶ 23; D.I. 28, at 8-9.

[120] Trial Tr. 178:6-16; *id.* 182:1-21.

[121] *Id.* 93:4-18; *id.* 74:11-15.

[122] *Id.* 180:15-24.

[123] *Id.* 183:6-14; JX-027, at 3; *id.*, at 4 (the Company "did not disclose financial information after July 28, 2014.").

litigation in New York, with no evidence that competitors have used that information against the Company.[124] This evidence of harm to the Company is limited, but the Company does not need to "show specific harm" to justify confidentiality.[125]

The Company also contends that confidentiality is necessary or appropriate because Rivest can accomplish his valuation purpose under a confidentiality agreement.[126] This would seem to improperly shift the burden under *Tiger* away from the Company, which may result in the reflexive conclusion that the Delaware Supreme Court warned against.[127]

In addition, the Company claims that it cannot afford to go after Rivest for a breach of any nondisclosure agreement.[128] The evidence does not support a conclusion that Rivest will breach court-ordered confidentiality, and a failure to comply with such an order could be enforced by this Court and not require a separate action.[129]

---

[124] *See* JX-031; JX-032; JX-033; JX-034; Trial Tr. 183:15-22.

[125] *Tiger*, 214 A.3d 933, 939 (Del. 2019) (internal quotation marks and citations omitted).

[126] Trial Tr. 224:23-225:1; *see also* Stip., ¶ 15.

[127] *See Tiger*, 214 A.3d at 939.

[128] Trial Tr. 233:12-234:6.

[129] Rivest testified that he had been accused of publishing nonpublic financials of a deregistered OTC company on a website in the past. *Id.* 62:7-63:6. But there was no evidence proving that he had done so. And, Rivest stated that he would share the Company's financial information with market participants to assess the market value of the Company's stock "[i]f it was legal to do so." *Id.* 68:1-5.

Finally, I consider Tucciarone's testimony that if he came into the possession of a competitor's financial information showing poor performance, "[the Company] would use it against one of our competitors."[130]  Tucciarone's admission depicts the competitiveness of the environment in which the Company operates.  His candor in admitting that he would use a competitor's poor financial performance against them indicates that competitors would likewise use the Company's financial information against it to achieve whatever advantage the competitor could get.[131]  The evidence suggests that, should the Company's current nonpublic financial information fall into the hands of a competitor, the Company may well face harm.[132]

---

[130] *Id*. 184:16-17.

[131] This is supported by the specific incident involving the loss of a major purchaser in 2014, although that evidence is less compelling because of its age. *See id*. 93:9-18.

[132] The Company also suggested at times that Regulation FD under the Securities Exchange Act of 1934 required confidentiality. Trial Tr. 111:5-112:22.  At trial, the parties disputed whether Regulation FD applied to the Company. *Compare id*. 98:12-100:13 *with id*. 111:9-116:13.  But, in its closing arguments, the Company took the position that Regulation FD does not play into the harms and benefits analysis under *Tiger*. *Id*. 254:7-12.  So I need not consider the effects of Regulation FD, to the extent that it applies to the Company.  I note, though, that this Court has declined to consider the effects of Regulation FD in crafting use and confidentiality restrictions on a Section 220 production.  *See Southpaw Credit Opportunity Master Fund LP v. Advanced Battery Techs., Inc.*, 2015 WL 915486, at *11 (Del. Ch. Feb. 26, 2015) ("Whatever their obligations under Regulation FD, the parties may independently assess those obligations and determine how to comply with them without an order from this Court. In addition, I do not believe ordering parties to comply with federal law is consistent with the intent of Section 220. The inspection right afforded to stockholders under Section 220 is an important feature of the Delaware General Corporation Law, but it is a right entirely separate from the complex overlay of rights and regulations created under the federal securities laws.").

In conclusion, weighing all of the arguments concerning the benefits and harms if confidentiality is imposed, I find there is sufficient evidence to support limited confidentiality restrictions, but not of the duration that the Company requests.

The next inquiry focuses on the duration of confidentiality protections.[133] The Company seeks the "strongest and most restrictive confidentiality protections," or "five years of confidentiality protection."[134] Rivest argues for no confidentiality restrictions because the books and records requested are stale.[135] The materiality of financial information "lessens as it ages."[136] Courts have recognized the difficulty in setting a precise "moment in time" when non-public financial information becomes stale and have varied in their determinations as to when confidential treatment becomes unnecessary.[137] Based on the circumstances in this case

---

[133] *See Tiger*, 214 A.3d 933, 939 (Del. 2019).

[134] Trial Tr. 228:17-229:2; *id.* 245:5-7.

[135] D.I. 51, at 28-29.

[136] *Ravenswood Inv. Co., L.P. v. Winmill & Co. Inc.*, 2014 WL 7451505, at *1 (Del. Ch. Dec. 31, 2014).

[137] *See*, *e.g.*, *id.* ("financial information does not warrant confidential treatment after three years from the date of the document or information"); *Quantum Tech. Partners IV, LP v. Ploom, Inc.*, 2014 WL 2156622, at *18 (Del. Ch. May 14, 2014) (upholding a five year sunset provision for confidential designation since the information "likely will be so stale that its competitive value will be non-existent"); *Ad-Venture Cap. Partners, LP v. ISN Software Corp.*, CA. No. 6618-VCG (Del. Ch. Mar. 5, 2012) (TRANSCRIPT at 7:1-6) ("[I]t seems to me that it is likely that whatever the competitive value of the documents that I have ordered disclosed is that it will be so significantly reduced over a two-year period that that's the appropriate length of time."); *see also Baker v. Sadiq*, 2016 WL

27

involving a stockholder seeking to value his shares, I conclude that a two-year confidentiality restriction is warranted. Information that is less than two years old will be subject to a confidentiality restriction. Rivest has an interest in being able to share the financial information he learns from the inspection with other investors who may be interested in purchasing his holdings in the Company's stock.[138] However, this interest must be weighed against the recognized harm to the Company in having its competitively sensitive information become publicly available.[139] The testimony about the Company at trial suggested that the Company's financial information will show a shift corresponding to the COVID-19 pandemic around February of 2020.[140] It appears that information predating February of 2020 would have significantly less competitive value.[141] Therefore, the financial information produced by the Company that is less than two years old will be subject to a confidentiality restriction.

---

4988427, at *2 (Del.Ch. June 8, 2016) (ORDER) (denying confidential designation of financials "from more than three years ago" because of staleness); *Southpaw Credit Opportunity Master Fund LP v. Advanced Battery Techs., Inc.*, 2015 WL 915486, at *10 (Del. Ch. Feb. 26, 2015) ("I am skeptical that financial results dating back more than a year are entitled to confidential treatment.").

[138] Trial Tr. 40:19-41:9.

[139] *Tiger*, 214 A.3d 933, 939 (Del. 2019).

[140] Trial Tr. 186:11-17.

[141] *See also id.* 185:7-9.

## III. Conclusion

I recommend that the Court enter judgment in favor of Rivest and order the inspection of the Company's quarterly and annual financial statements and reports, including cash flow statements, balance sheets and income statements, for years 2016 through 2020, subject to a confidentiality provision protecting financial information less than two years old. Upon this Report becoming final, counsel are directed to confer and submit an implementing order, a confidentiality agreement, and a status report or briefing schedule regarding their attorneys' fees claims. This is a final Master's Report, and exceptions may be taken under Court of Chancery Rule 144(d)(1), with any party filing a notice of exceptions within eleven (11) days of the date of this Report.[142]

The stays on the periods for taking exceptions to the September 21, 2021 Order denying the Company's Motion for Summary Judgment,[143] the September 21, 2021 Order granting Rivest's Motion for Leave to File Supplement to the Complaint,[144] the October 14, 2021 bench ruling and final Master's Report denying

---

[142] I recognize that, by statute, this action is a summary proceeding and Rule 144(d)(2)'s shortened three-day period for taking exceptions would ordinarily apply. *See Mennen v. Fiduciary Tr. Int'l of Del.*, 167 A.3d 507, 511 (Del. 2016). However, given the circumstances and duration of these proceedings, I find it is appropriate to follow the ordinary eleven-day schedule for taking exceptions.

[143] D.I. 41.

[144] D.I. 42.

(1) the Company's Emergency Motion to Amend the Scheduling Order, for Relief from Order, or, in the Alternative, to Continue Trial,[145] and (2) the Company's application to seal the trial,[146] are lifted, and exceptions on those matters shall also be taken under Court of Chancery Rule 144(d)(1).

---

[145] D.I. 56; PTC Tr. 30:19-38:9.

[146] D.I. 56; PTC Tr. 85:1-86:14.